RECEIVED
OCT 2 3 2014
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| ROBERT CRAIG ANDREW, ET AL. | CIVIL ACTION NO. 6:13CV814 |
| VERSUS | JUDGE DOHERTY |
| PATTERSON MOTOR FREIGHT, INC., ET AL. | MAGISTRATE JUDGE HANNA |

## MEMORANDUM RULING

Currently pending before the Court are the following motions: (1) plaintiff's "Motion in Limine to Strike and/or Limit Certain Testimony of Lay Witness, George 'Tracy' Latiolais" [Doc. 47]; (2) "Defendants' Motion in Limine/*Daubert* Challenge to Exclude or Limit the Trial Testimony and Evidence of Dr. Eduardo Gonzalez-Toledo and Request for Hearing" [Doc. 51]; and (3) "Defendants' Motion in Limine/*Daubert* Challenge to Exclude the Trial Testimony and Evidence of Dr. Mark S. Warner, Ph.D" [Doc. 52].[1]

Considering the law, the facts in the record, and the arguments of the parties, the Court GRANTS plaintiffs' motion to limit the testimony of George "Tracy" Latiolais [Doc. 47]; the Court DENIES IN PART and DEFERS IN PART defendants' motion in limine/*Daubert* challenge to Dr. Eduardo Gonzalez-Toledo [Doc. 51]; and the Court DENIES IN PART and DEFERS IN PART defendants' motion in limine/*Daubert* challenge to Dr. Mark S. Warner [Doc. 52].

---

[1] Additionally pending are: "Defendants' Motion in Limine/*Daubert* Challenge to Exclude the Trial Testimony and Evidence of John W. Theriot and Request for Hearing" [Doc. 53], and plaintiffs' "Motion to Exclude Expert Witness, Frank Stagno, CPA/ABV and/or Motion in Limine as to Defendants' Proffered Expert Testimony and Report Regarding Mitigation of Damages and Reasonable Alternatives" [Doc. 67]. Those motions will be addressed by separate ruling.

I.  **Factual Background**

This matter involves a motor vehicle accident occurring on June 29, 2012, in the town of Broussard, Louisiana. [Doc. 1, ¶¶ 6, 7] According to the complaint, plaintiff Robert Andrew was injured when he was struck by a tractor-trailer operated by defendant Cecil A. French. [Id. at ¶ 7] Plaintiff alleges Mr. French was in the course and scope of his employment with defendant Patterson Motor Freight, Inc. at the time of the collision. [Doc. 5, ¶ 3] Plaintiff alleges as a result of the accident, he "sustained a Traumatic Brain Injury to the frontal lobe resulting in residual deficits in the areas of emotion, impulsivity, personality, and short term memory." [Doc. 48, p.3] Plaintiff additionally alleges he sustained a fracture of a thoracic vertebrae (for which he underwent a T8 Kyphoplasty), and damages to the facets at the L4-5 region of the spine (with a recommendation of an L3-4 and L4-5 fusion with rods). [Id.] Plaintiff asserts he "has suffered and continues to suffer with severe back pain and general body pain, cognitive difficulties, headaches, sleep deprivation and disturbances, mood uncertainties, and confusion."[2] [Id.] Trial of this matter is scheduled for December 8, 2014. [Doc. 26]

II. **Standards of Review**

A.  **Lay Testimony**

Rule 602 of the Federal Rules of Evidence states in pertinent part: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. If it is determined the witness does have personal knowledge of the

---

[2]Plaintiff's wife, Susan M. Andrew, asserts a claim for loss of consortium. [Doc. 1, ¶ 12] References herein to "plaintiff" are to Robert Andrew.

matters to which he intends to testify, the nature of the witness' testimony is further limited by Rule 701, which provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701; *see also U.S. v. Ebron*, 683 F.3d 105, 137 (5th Cir. 2012)("A lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury.")

### B. Expert Testimony

To be admissible at trial, expert testimony must satisfy the conditions of Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A district court has considerable discretion in deciding whether to admit or exclude expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e

conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *General Elec. Co. v. Joiner*, 522 U.S. 136, 139-40 (1997)(abuse of discretion is the standard of review).

"Rule 702 requires trial courts to ensure that proffered expert testimony is 'not only relevant, but reliable.'" *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 535 (5th Cir. 2013)(quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). "To determine whether proffered testimony is reliable, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* (quoting *Daubert* at 592-93). Courts should consider scientific expert testimony in light of factors that help determine the reliability of that testimony. *Daubert* at 589, 592-94. In this reliability analysis, courts may rely on factors such as those suggested by the *Daubert* court: "whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can and has been tested; whether the known or potential rate of error is acceptable; and whether there are standards controlling the technique's operation." *Broussard v. State Farm Fire and Cas. Co.*, 523 F.3d 618, 630 (5th Cir.2008). "*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (emphasis in original). "The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002)(quoting *Kumho*, 526 U.S. at 152)). The focus of reliability "must be solely on principles and methodology, not on the conclusions they

generate." *Daubert*, 509 U.S. at 595.

"[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility . . . ." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir.1996)(internal quotations and citations omitted). "It is the role of the adversarial system, not the court, to highlight weak evidence . . . ." *Primrose Operating Co. v. Nat'l American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert* at 596 (citation omitted).

### III. Mr. George "Tracy" Latiolais

In 2005, plaintiff and Mr. Tracy Latiolais formed A&L Repair Service, LLC, an oilfield service company specializing in the repair of oilfield equipment, such as drill pipe spinners, kelly spinners, and power tongs.[3] [Doc. 48, pp. 6-7] Plaintiff and Mr. Latiolais each owned fifty percent of the company. [Id. at 6; Doc. 64, p. 2] In August 2013, Mr. Latiolais unilaterally made the decision to close down A&L Repair. [Doc. 48, pp. 7-8; Doc. 64, pp. 3-4] According to both plaintiff and Mr. Latiolais, Mr. Latiolais made the decision to close down A&L Repair because he was concerned the medications plaintiff was prescribed to address injuries sustained in the motor vehicle accident impaired plaintiff and might cause an accident, thereby exposing the business (and Mr. Latiolais) to liability. [*See e.g.* Doc. 64-1, pp. 15, 18-19; Doc. 47-6, pp. 3-4] According to plaintiff, he tried to explain to Mr. Latiolais the behaviors about which Mr. Latiolais was concerned were due to effects

---

[3]In 2006, plaintiff and Mr. Latiolais additionally formed A&L Construction, LLC, a real estate holding company that owned the A&L Repair office building/shop, and received rental payments from A&L Repair for the use of this space. [Doc. 60-2, pp. 4, 6]

of the brain injury he incurred, rather than his prescribed medications. [Doc. 64-1, pp. 18-19] However, Mr. Latiolais was adamant that unless plaintiff discontinued his medications, the business would be closed. [Id.] As noted, Mr. Latiolais closed A&L Repair in August 2013.

By this motion, plaintiff seeks an order prohibiting Mr. Latiolais from testifying certain behaviors of plaintiff were caused by plaintiff's use of prescribed medications. [Doc. 48, pp. 16, 17] Plaintiff agrees Mr. Latiolais may testify as to: "his perceptions that after the crash Mr. Andrew's <u>behavior</u> changed," the behavior change affected plaintiff's work performance, and the behavior change led to Mr. Latiolais' decision to shut down the business. [Id. at 17 (emphasis in original)] However, plaintiff argues Mr. Latiolais should not be allowed to testify the *cause* of plaintiff's behavior change was due to medication. [Id. at 16-17] Counsel for plaintiff notes Mr. Latiolais testified in his deposition he did not know what medications plaintiff was taking, the dosage of those medications, or the side effects caused by the medications.

Defendants argue such testimony is properly admissible based upon Mr. Latiolais' observation of plaintiff, and because Mr. Latiolais had been told by plaintiff he was taking medications due to the injuries sustained in the accident. [Doc. 64, p. 6] Defendants additionally argue this testimony is relevant to the issue of damages for loss of wages, because Mr. Latiolais testified the reason they closed the business "was because of Andrew's medication usage and the resulting impairment."[4] [Id.] Finally, defendants argue, "[a]ny concerns Plaintiffs may have can be

---

[4]Defendants argue Mr. Latiolais' reason for closing the business (*i.e.* his concern A&L would face liability in the event plaintiff's impairment from medications caused an accident) is relevant, because plaintiff is seeking "damages associated with the closure of the businesses. . . ." [Doc. 64, pp. 2, 3, 6] However, as noted by plaintiff, "A & L Repair Services, LLC is not a party to this litigation and Mr. Andrew is not by pleading financial damages stemming from the closure of this entity on behalf of the LLC." [Doc. 67-3, p. 18; *see also* Doc. 48, p. 18] Rather, plaintiff is seeking damages for lost wages and lost earning capacity he *personally* incurred as a result of this accident. [*See e.g.* Doc. 1, ¶ 11; Doc. 48,

fully addressed in cross-examination."

The Court finds Mr. Latiolais lacks the qualifications necessary to provide his opinion as to the *cause* of plaintiff's behavior, and thus, his opinion plaintiff's behavior was caused by prescribed medications lacks foundation. Fed.R.Evid. 701(where witness is not testifying as an expert, opinion testimony is limited to opinions based on perception, if helpful, and if not based on scientific, technical, or other specialized knowledge). Again, Mr. Latiolais testified he does not know what medications plaintiff was taking or their dosage; other than "a broken back," he does not know what injuries plaintiff sustained; and he has no experience dealing with someone with a brain injury. [Doc. 47-6, pp. 16-18, 20, 22]

The Court additionally finds the foregoing testimony should be excluded pursuant to Federal Rule of Evidence 403, which provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here, the Court finds any probative value of the testimony at issue would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and/or misleading the jury, in that it would present plaintiff to the jury as a potential drug abuser, where no evidence has been presented regarding same, and there are alternative explanations for the behavioral changes (*i.e.* the effects of a brain injury).

For all of these reasons, the Court finds while Mr. Latiolais may properly testify about his observations of plaintiff's behavior, he lacks sufficient personal or scientific knowledge to testify as to *the cause* of such behavior changes. *See e.g. Graves ex rel. W.A.G. v. Toyota Motor Corp.*,

---

p.18; Doc. 67-3, pp. 18-19]

2011 WL 4590772, *8 (S.D.Miss.)("An opinion based upon the assumption of the existence of an important fact cannot meet the Rule 701 test.") Accordingly, the Court grants plaintiff's motion, and Mr. Latiolais will be prohibited from testifying plaintiff's behavior changed *due to his use of prescribed medications*.

### IV. Dr. Eduardo Gonzalez-Toledo

By this motion, defendants assert plaintiff's neuroradiology expert, Dr. Eduardo Gonzalez-Toledo, should be prohibited from testifying at trial, and "all evidence associated with him" should be excluded. [Doc. 51, p.1] Alternatively, defendants move for an Order limiting his testimony, "to exclude the images created with the Brain Suite program." [Id.; *see also* Doc. 56, p.3] Defendants request a "pre-trial '*Daubert* Hearing' on this motion. . . ." [Id. at 2] In support of their motion, defendants argue: (1) Dr. Gonzalez-Toledo is not qualified in the field of neuroradiology; (2) "the methodology that he utilized for his analysis is not widely accepted for the diagnosis of traumatic brain injury (TBI)"; and (3) "his testimony will be cumulative with that of Plaintiff's treating physicians and other expert and will not be helpful to the court." [Doc. 51-2, p.1]

#### A. Qualifications

Defendants argue Dr. Gonzalez-Toledo "does not meet the criteria of having sufficient specialized knowledge to assist the trier of fact," because "he does not possess the necessary board certification to be recognized as a neuroradiologist or a neurosurgeon in the United States." [Id. at 4] According to defendants, Dr. Gonzalez-Toledo's "designation as 'neuroradiologist' is self-selected." [Id.] Defendants note Dr. Gonzalez-Toledo "has prior certifications in neurosurgery and radiology from Argentina, but he is only licensed to practice radiology in Louisiana." [Id.]

According to Dr. Gonzalez-Toledo's affidavit: he is "a medical doctor specializing in neuroradiology," licensed by the Louisiana State Board of Medical Examiners; he is the Director of Neuroradiology at LSU Health Sciences Center in Shreveport and the Director of Research for the Department of Radiology at University Health (formerly known as LSU Health Sciences Center in Shreveport); he is a tenured professor of Radiology, Neurology and Anesthesiology at University Health; for over forty-five years, he has been teaching, researching, practicing, and publishing articles about neurology, radiology, neurosurgery, CT technology, MR technology and neuroimaging; he has published nearly 200 publications, including books, chapters in books, and articles in journals in the fields of radiology, neurology, and neuroradiology; he is a member of many professional societies, including the American College of Radiology and the American Society of Neuroimaging; he became board certified in neurosurgery by the Argentine College of Neurosurgeons in 1971, and was certified in radiology by the Ministry of Public Health in Argentina in 1977; he was board certified in both diagnostic imaging and neurosurgery by the National Academy of Medicine's Council for Certifications of Medical Professionals in Argentina shortly after it was created in 1994; in 2010, the United States' Accreditation Council for Graduate Medical Education ruled the foregoing credentials "were equivalent to board certification by the American Board of Radiology." [Doc. 59-5, ¶¶ 1, 3-4, 44, 46-47, 53-54]

The Court finds the foregoing credentials qualify Dr. Gonzalez-Toledo to testify as an expert in the field of neuroradiology and notes, however, that defendants will have full opportunity to traverse Dr. Gonzalez-Toledo as to his qualifications at trial, if defendants so desire.

B.   Methodology

1.   **Cortical Reconstruction/Cortical Thickness Measurement**

According to Dr. Gonzalez-Toledo, Cortical Reconstruction or Cortical Thickness Measurement ("CTM") is a type of neuroimaging that detects changes in the cortical surface - *i.e.*, "the area where the gray matter covers the cerebral hemispheres, where the higher nervous system centers are located." [Doc. 51-4, p.1; Doc. 59-5, ¶ 6] To conduct CTM, Dr. Gonzalez-Toledo performs an MRI, the data from the MRI is processed through BrainSuite software, resulting in 3D reconstructed images of the cortical surface. [Doc. 59-5, ¶¶ 32-33, 35; Doc. 59, p.4; Doc. 51-4, p.2] According to Dr. Gonzalez-Toledo, CTM "demonstrate[s] evidence of traumatic brain injury pathology and can reveal abnormalities that are not visible on standard MRIs." [Doc. 59-5, ¶ 21; Doc. 51-4, p.3] As noted by defendants, according to the BrainSuite website:

> BrainSuite is a collection of software tools that enable largely automated processing of magnetic resonance images (MRI) of the human brain. The major functionality of these tools is to extract and parameterize the inner and outer surfaces of the cerebral cortex and to segment and label gray and white matter structures. BrainSuite also provides several tools for visualizing and interacting with the data.

[Doc. 51-2, p.6 (citing http://brainsuite.org/ (August 19, 2014))]

Defendants argue Dr. Gonzalez-Toledo's testimony should be excluded because "it is not based on sufficient data and facts, and the methodology that he utilized for his analysis, i.e., reconstructing images from MRI data through the use of Brain Suite software, is not widely accepted for the diagnosis of traumatic brain injury (TBI)." [Doc. 51-2, pp. 4-5] Alternatively, defendants move for an order "limiting the testimony and evidence . . . to exclude the images created with the Brain Suite program." [Doc. 51, p.1] Defendants note they "do not object to the underlying data [i.e. the MR images], but to the prejudicial and misleading reworking of the data and presentation of it

-10-

by the created images produced by postprocessing software." [Doc. 80, pp. 1-2]

With regard to methodology, defendants argue "cortical mapping . . . is currently a research tool and is not used in clinical diagnostics and decision-making," citing the affidavit of their expert neuroradiologist, Dr. Partington.[5] According to defendants, the images of plaintiff's brain attached to Dr. Gonzalez-Toledo's report are "excerpted from the MRI," and then "processed to show the surface of the brain with color of an arbitrary value superimposed on these images." [Doc. 52-2, p.6] Defendants continue, "In his report, Dr. Gonzalez-Toledo stated that the areas that are color-coded in blue on these maps show evidence of traumatic brain injury."[6] [Id.] According to Dr. Partington, when the areas in blue on the CTM images are compared to the same areas of the brain on the MRI images, no abnormality is observable. [Id.; *see also* Docs. 59-24, p. 12; 54-3, p.3; 51-7, p.2] In other words, defendants argue "[t]he data itself is normal and shows no evidence of traumatic injury."[7] [Id. at 7] In light of the foregoing, defendants conclude:

> Dr. Gonzalez-Toledo's use of the Brain Suite software for diagnostic purposes has not been sufficiently tested and subjected to peer review and publication in the field of traumatic brain injury to be reliable. The potential rate of error is

---

[5]According to Dr. Gonzalez-Toledo's affidavit, CTM is "used clinically at University Health as a diagnostic tool," and it is "used clinically in other parts of the country and is reimbursable by some health insurance companies." [Doc. 59-5, p.4]

[6]The Court notes Dr. Gonzalez-Toledo's states the "compromised portions of the cortex" are shown in "blue and yellow colors." [Doc. 51-4, p.2]

[7]Again, according to Dr. Gonzalez-Toledo, the reason one conducts CTM is precisely because it "demonstrate[s] evidence of traumatic brain injury pathology and can reveal abnormalities that are not visible on standard MRIs." [Doc. 59-5, ¶ 21] Additionally, the Court notes, when pressed by plaintiff's counsel on the issue of the purported inconsistencies between plaintiff's CTM and MRI images, Dr. Partington testified: "And I will admit that I am not well-versed enough in cortical mapping to know whether a normal person, are they absolutely homogenous red, absolutely homogenous blue. . . . And I just don't have enough experience with it and knowledge of it to know what the normal variations are." [Docs. 56-1, p.6; 59-24, p. 13] He further admits it is speculation on his part as to whether the areas in blue shown on the CTM images must match the MRI images. [Doc. 59-24, p. 13]

unknown, Dr. Gonzlez-Toledo offered no standards controlling its operation; and it is not generally accepted within the neuroradiology field as a reliable clinical diagnostic tool. *Daubert, supra.*

[Id. at 8][8]

In support of their argument that Dr. Gonzalez-Toledo's testimony is based on insufficient facts and data, defendants argue Dr. Gonzalez-Toledo "never met Plaintiff or observed his behavior" and, based solely upon the MRI he conducted and his "reconstruction of the data from that MRI in Brain Suite, . . . he claims that Mr. Andrew suffered a traumatic brain injury during the motor vehicle accident." [Doc. 51-2, p.5 (citing Dr. Gonzalez-Toledo's expert report)] However, according to defendants, in his deposition, Dr. Gonzalez-Toledo "admitted that he cannot say that this accident caused the alleged damage to the brain." [Id.] The Court will not exclude Dr. Gonzalez-Toledo's testimony on the basis of the argument now presented by defendants. Rather, after testimony and opportunity for objection, should CTM testimony be admitted at trial, this issue can be fully addressed on cross-examination. *See e.g. Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness . . ., an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"); *Bryan v. John Bean Division of FMC Corp.*, 566 F.2d 541, 546 (5th Cir. 1978)("experts particularly doctors customarily rely upon third party reports from other

---

[8]To the extent defendants argue the cortical mapping images are unreliable because "it is impossible to discern what parameters Dr. Gonzalez-Toledo set to get the results he presented in his report," the Court disagrees. [Doc. 54-2, p.3] This argument is based on testimony of Dr. Partington, wherein he was asked if he could explain why the MRI images show a normal brain, whereas the CTM images show abnormality. Dr. Partington could not explain, but stated, "[m]y guess would be, and its strictly speculation on my part," that one could change the parameters on the software to show increased abnormality where none existed. [Doc. 56-1, p. 8] However, Dr. Gonzalez-Toledo states in his affidavit "[t]he software has preset conditions and settings that are recommended by physicists at . . . UCLA," and he "does not modify the settings, change the parameters or make any changes to the software." [Doc. 59-5, p. 10] Accordingly, the Court will not exclude Dr. Gonzalez-Toledo's testimony on the basis "it is impossible to discern what parameters Dr. Gonzalez-Toledo set to get the results he presented in his report."

experts such as pathologists and radiologists in whom the testifying expert places his trust"); Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed").

As their final argument, defendants assert "the probative value of Dr. Gonzalez-Toledo's reconstructed images and analysis is substantially outweighed by the likelihood that the jury will be confused or mislead by the compelling visuals of the images produced by the Brain Suite imaging technology." [Doc. 51-2, p.9] According to defendants, "The images produced by the software, while not accurately reflecting the status of Plaintiff's brain, are colorful, arresting, and likely to impress the average juror who may not understand the nature and origin of the images and what they actually portray." [Id.]

With regard to CTM, itself, the Court finds, at this juncture, it has insufficient information to determine whether the testimony and evidence is reliable. While Dr. Gonzalez-Toledo has provided a number of <u>conclusory</u> statements and open opinions regarding the reliability of CTM, he has not provided an underlying bases for those opinions. "To establish reliability under *Daubert*, an expert bears the burden of furnishing 'some objective, independent validation of [his] methodology.'" *Brown v. Illinois Cent. R. Co.*, 705 F.3d at 536 (quoting *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). Accordingly, the Court will grant defendant's motion for a pre-trial *Daubert* hearing to address the reliability of CTM and Dr. Gonzalez-Toledo's reliance thereon. At the hearing, plaintiff should focus his argument and evidence on factors such as: whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can be and has been tested; whether the known or potential rate of error is known or if known, acceptable; and whether there are standards

controlling the technique's operation. *Broussard*, 523 F.3d at 630. The hearing will be set by separate minute entry.

### 2. Diffusion Tensor Imaging ("DTI")

According to Dr. Gonzalez-Toledo, diffusion tensor imaging ("DTI") is "an MRI method that examines the microstructure of the white matter of the brain, allowing for the detection of microscopic pathology or abnormality of the white matter." [Doc. 59-5, ¶ 7] More specifically:

> DTI measures the direction of movement or flow (known as diffusion) of water molecules through tissue. Water moves through damaged tissue at different rates and in different directions than it does [in] healthy tissue. DTI is based upon the basic physics of the flow of water. With no barriers to flow, water will move in isotropic distribution, which means it will move equally in all directions. If there are barriers to flow, it will move anisotropically or unequally in all directions like a perforated sprinkler-hose. As the water molecules flow through brain tissue, the water molecules follow the nerve fibers, and so by reconstructing these trajectories, DTI can image the nerve fibers.

[Doc. 59-5, p. 5] "The majority of people who have sustained mild traumatic brain injury (mTBI) have normal MRI and CT findings, even when significant neurological impairments exist as a result of the traumatic brain injury." [Id.] "DTI is a more sensitive technology that can reveal damage that is not visible on standard MRIs." [Id. at ¶ 9] To perform DTI, Dr. Gonzalez-Toledo performs an MRI, and then inputs the data obtained from the MRI into software called "3D Slicer," resulting in 3D reconstruction of the fiber tracts. [Id. at ¶¶ 32-35; Doc. 51-4, p. 2]

At this juncture, the Court must note defendants make no attack against the use of DTI until their reply brief. While they ask this Court to exclude both DTI and CTM evidence in their original and supplemental motion in limine, all arguments contained in those documents are addressed toward the use of the BrainSuite software (and thus, CTM). The majority of defendants' argument against Dr. Gonzalez-Toledo's methodology (*i.e.* DTI is not widely accepted for the diagnosis of

TBI) is based upon a single article entitled *Guidelines for the Ethical Use of Neuroimages in Medical Testimony*. According to defendants, this article supports their position that "[t]he postprocessed images are vibrant and visually arresting, and likely to impress the average juror who will likely not understand how the images are created, what they actually show, and whether they are reliable." [Doc. 80, p.3] Defendants additionally note the article "cites concerns about bias, such as the hindsight bias, by which radiologists are more likely to detect an abnormality on imaging when they are told in advance to expect one," as well as concerns that "'in cases that use functional neuroimaging methods typically performed in the research setting, the expert may be influenced by a professional investment in promoting his or her research area or specific research findings.'" [Id.] Defendants then state the same concerns "may very well be at play here. . . ." [Id.] The Court finds these are all matters for cross-examination and not a basis for blanket exclusion of Dr. Gonzalez-Toledo's testimony.

Defendants note the article states DTI "results may vary by scanner field strength, scanner type, pulse sequence, and postprocessing." [Id. at 3-4; Doc. 74-3, p.3] However, Dr. Gonzalez-Toledo has provided all the relevant information necessary for defendants to explore this topic on cross-examination. [*See* Doc. 59-5, ¶¶ 31-33, 35-38] Defendants additionally assert Dr. Gonzalez-Toledo was "required" to include a disclaimer in his report, but failed to do so. [Doc. 80, pp. 4-5] First, the Court notes the disclaimer is "suggested" - not required. Second, the Court notes the disclaimer is addressed toward physicians and not jurors. [*See* Doc. 74-3, p.4; 59-21, p.5] Regardless, this issue can be fully addressed on cross-examination. The remainder of defendants argument against admission of DTI evidence is based upon defendants' expert's assertion of the ways in which he alleges Dr. Gonzalez-Toledo did not follow the "proposed" guidelines set forth

in the referenced article. Again, all of these issues are matters for cross-examination, and not the basis for blanket exclusion of evidence.

Unlike CTM, the Court finds plaintiff has submitted sufficient evidence to show the reliability of DTI. In sum, the evidence submitted shows DTI has been tested and has a low error rate [Doc. 59-5, ¶¶ 12, 20-21, 30; Doc. 59-9]; DTI has been subject to peer review and publication [Doc. 59-5, ¶ 30; Doc. 59-9]; and DTI is a generally accepted method for detecting TBI [Doc. 59-5 at ¶ 7-12, 14, 18-19, 21, 30-31]. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94. The Court additionally notes DTI testimony has been admitted by several courts. *See e.g. Ruppel v. Kucanin*, 2011 WL 2470621 (N.D.Ind.); *Hammar v. Sentinel Ins. Co., Ltd.*, No. 08–019984 (Fla.Cir.Ct.2010) [Doc. 59-11]; *Booth v. Kit*, 2009 WL 4544743 (D.N.M.). Accordingly, the Court denies defendants' motion to the extent it seeks to exclude evidence and testimony regarding DTI.

**V.      Dr. Mark S. Warner**

By this motion, defendants argue the evidence and testimony offered by plaintiff's neuropsychology expert, Dr. Mark S. Warner, should be excluded, or alternatively, limited. [Doc. 52, p.1] In support of this position, defendants argue Dr. Warner's methodology is "flawed and unreliable," as well as cumulative. [Doc. 52-2, p.1] Defendants argue Dr. Warner's methodology is flawed because: (1) he never met or examined plaintiff; (2) "[h]is opinion is based solely upon the reported findings of other treating professionals and his general knowledge of the science surrounding traumatic brain injury"; and (3) because one of the expert opinions upon which Dr. Warner relies is that of Dr. Gonzalez-Toledo, who is the subject of a defense *Daubert* motion. [Id. at 4-5] Defendants argue Dr. Warner's testimony is cumulative, because defendants anticipate plaintiff will present testimony from his treating physicians (*i.e.* his treating neurosurgeon,

neuropsychologist, and psychiatrist). [Id. at 2, 6]

As to defendants' argument Dr. Warner's methodology is flawed because he never examined plaintiff, and his opinion is based "solely upon the reported findings of other treating professionals and his general knowledge of the science surrounding traumatic brain injury," the Court notes defendants have provided no legal authority in support of this argument. Rather, "experts[,] particularly doctors[,] customarily rely upon third party reports from other experts such as pathologists and radiologists in whom the testifying expert places his trust." *Bryan v. John Bean Division of FMC Corp.*, 566 F.2d 541, 546 (5th Cir. 1978); *see also Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness . . ., an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"). Federal Rule of Evidence 703 provides, "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed". As the notes to Fed. R. Evid. 703 make clear, the rule contemplates opinions based upon data provided to the expert "outside of court and other than by his own perception." Fed. R. Evid. 703 (1972 Notes). Furthermore, "'[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *U.S. v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)(quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). Accordingly, defendants' motion will be denied on the basis of this argument.

As to defendants' argument Dr. Warner's testimony should be excluded because it relies upon the opinion of Dr. Gonzalez-Toledo, the Court defers ruling until after the *Daubert* hearing regarding CTI testimony and Dr. Gonzalez-Toledo's reliance thereon. Should it be found evidence

of CTI is inadmissible, then the Court will exclude any opinions of Dr. Warner based <u>solely</u> upon his reliance of Dr. Gonzalez-Toledo's CTM studies.

The Court additionally defers addressing whether Dr. Warner's testimony is cumulative until the evidence is heard at trial, but cautions plaintiffs, cumulative testimony will not be allowed. Defendants (as well as plaintiff) may object to cumulative testimony from any witness if and when such an event occurs at trial.

## VI.  Conclusion

In light of the foregoing reasons, the Court GRANTS plaintiffs' motion to limit the testimony of George "Tracy" Latiolais [Doc. 47]; the Court DENIES IN PART and DEFERS IN PART defendants' motion in limine/*Daubert* challenge to Dr. Eduardo Gonzalez-Toledo [Doc. 51]; and the Court DENIES IN PART and DEFERS IN PART defendants' motion in limine/*Daubert* challenge to Dr. Mark S. Warner [Doc. 52].

THUS DONE AND SIGNED in Lafayette, Louisiana, this 23 day of October, 2014.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE